******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

RUMA CHOWDHURY *v.* MURAKIB MASIAT
(AC 36130)

Beach, Keller and Mihalakos, Js.

*Argued May 18—officially released November 17, 2015*

(Appeal from Superior Court, judicial district of
Ansonia-Milford, Turner, J.)

*Karen L. Dowd*, with whom was *Brendon P. Levesque*, for the appellant (plaintiff).

*David V. DeRosa*, for the appellee (defendant).

*Opinion*

MIHALAKOS, J. The plaintiff, Ruma Chowdhury, appeals from the judgment of the trial court dissolving her marriage to the defendant, Murakib Masiat. On appeal, the plaintiff claims that the court (1) improperly awarded child support for two, rather than three, eligible children; (2) deviated more than 20 percent from the presumptive child support award pursuant to the child support guidelines[1] (guidelines), without a necessary explanation; (3) divided marital assets based on clearly erroneous findings of fact; and (4) determined that the plaintiff failed to prove the existence of the parties' Nikahnama[2] and, therefore, improperly concluded that she was not entitled to receive $4815.40 as provided by that agreement. We affirm the judgment of the trial court as it relates to the Nikahnama, reverse the judgment as to the financial orders, and affirm the judgment in all other respects.

The following facts and procedural history are relevant to our review of the plaintiff's claimS. The court, after ten days of trial, made the following factual findings in its memorandum of decision dated July 23, 2013. It considered all of the evidence as well as a stipulation of facts dated June 26, 2012. The court found that the parties were married on March 9, 1995, as part of an arranged marriage in Bangladesh. At the time of their marriage, the parties allegedly entered into a "Nikahnama," referred to by the parties as a marriage contract or a marriage deed, which upon divorce would allow the plaintiff to collect $4815.40. Several versions of the document were submitted into evidence, but none of the versions had been signed by either party. Additionally, the court was presented with a joint stipulation signed by the parties and heard testimony at trial regarding the Nikahnama. The court found that the plaintiff failed to prove by a preponderance of the evidence "that the parties entered into a valid marriage contract (Nikahnama)," and therefore failed to prove that the defendant did not pay the amount promised, and that the plaintiff is owed $4815.40 pursuant to the alleged contract.

Additionally, the parties had three minor children issue of the marriage. At the time of trial, the oldest child, seventeen years of age, was about to graduate from high school and was to attend college the following year. The younger children were five and eleven years old, respectively.

At the time of the marriage dissolution, the plaintiff was receiving food stamps from the state of Connecticut and she and the minor children were recipients of medical assistance from the state of Connecticut.[3] The plaintiff was thirty-nine years old, had completed two years of high school in Bangladesh, but had not completed high school or an equivalent level of education in the

United States, or any further formal vocational training or education. Throughout the marriage, the plaintiff had been employed periodically at fast food restaurants and at a department store. The court determined her earning capacity to be $330 per week, which it arrived at by taking the current minimum wage of $8.25 per hour and multiplying it by a forty hour work week. The court also found that the plaintiff had made and continued to make "reasonable and diligent efforts to find gainful employment," and was presently employed as a part-time daycare provider, with an average gross income of $135 per week. The plaintiff had no source of financial support other than the defendant.

The defendant received a high school diploma in Bangladesh and, despite representations made on his resume, had not received any additional education. He had been continuously employed as a senior software test engineer at the Emerson Company since December, 2000, with a net income of $1148 per week. The defendant was also a licensed taxicab driver in New York City, and through 2012 drove a taxi on weekends, which netted on average $450 per weekend.[4] The court also found that both parties were in reasonably good health and able to work.

The court found that neither party brought significant assets to the marriage. The debts and liabilities of the parties were summarized, in relevant part, as follows: "The [defendant] utilized numerous credit cards he acquired in the [plaintiff's] name, without her consent or knowledge, including, a Juniper Barclay Master Card, an HSBC Master Card, two Chase cards, two Discover cards and a CITI Bank card. He used the cards, among other things, primarily to access funds to make expenditures for members of his family (other than the plaintiff and their children); to repay loans made to him by others; to make loans to others; for gambling expenses and to cover his gambling losses. His gambling losses at Mohegan Sun Casino exceeded $88,000. His gambling losses at Foxwoods Casino exceeded $110,000. Bank withdrawals of cash were made by him at the Mohegan Sun and Foxwoods Casinos exceeding $1800. As a result of his use of the credit cards there is an unknown but significant amount of credit card debt in the [plaintiff's] sole name, which she did not incur and was not for their joint or household benefit." The court made these findings regarding the defendant's gambling debt despite a joint stipulation signed by the parties, which stated that the defendant's gambling debt was $110,029. The court nonetheless found gambling losses in the amount of $198,000.

The court then made the following relevant orders. With regard to child support,[5] the court ordered: "No order of child support is entered for the [oldest] minor child . . . . He has graduated from high school, will be attending [college] in September 2013, and the par-

ties are ordered to contribute to his postsecondary education." The court also set forth a specific provision for postsecondary education for the oldest minor child.[6] Additionally, for the two remaining minor children, the court ordered that the defendant pay a sum of $250 per week to the plaintiff as child support, until they graduate from high school or attain nineteen years of age, whichever occurs first. With regard to the debts and liabilities incurred by the parties, the court ordered that the defendant should assume responsibility for paying multiple debts he had incurred in his wife's name, on the basis of its finding that these debts were largely incurred for his benefit and as the result of his gambling losses. Finally, with regard to the Nikahnama, as stated previously, the court ultimately determined that it was unenforceable and, therefore, it was unaccounted for in the financial orders.

Following the court's memorandum of decision, the plaintiff filed several motions. The plaintiff filed a motion for stay of execution of judgment, a motion to reargue, a motion for reconsideration of the orders entered in judgment, and a motion for clarification of decision and orders. In relevant part, these motions raised the claims brought on appeal. The plaintiff argued that the court deviated more than 20 percent from the child support guidelines without explanation. Further, the plaintiff argued, in pertinent part, that the court failed to account properly for three minor children, rather than two, in computing the proper child support order pursuant to the guidelines. Finally, the plaintiff argued that the court made clearly erroneous findings of fact related to, inter alia, the Nikahnama and the defendant's gambling debt, when the court factored in approximately $80,000 more debt than what was stipulated to by the parties. All of the plaintiff's four postjudgment motions were denied. The plaintiff then filed this appeal.

We begin by setting forth the standard of review necessary to our review of family matters. "The standard of review in family matters is well settled. An appellate court will not disturb a trial court's orders in domestic relations cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did, based on the facts presented. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . Appellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence

is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Demartino* v. *Demartino*, 79 Conn. App. 488, 492, 830 A.2d 394 (2003). The long-standing deference granted to the trial court "reflects the sound policy that the trial court has the unique opportunity to view the parties and their testimony, and is therefore in the best position to assess all of the circumstances surrounding a dissolution action, including such factors as the demeanor and the attitude of the parties." *Casey* v. *Casey*, 82 Conn. App. 378, 383, 844 A.2d 250 (2004).

Of great significance in the present case, we note that our review of financial orders entered by a trial court in a dissolution matter is governed by the mosaic doctrine. "Under the mosaic doctrine, financial orders should not be viewed as a collection of single disconnected occurrences, but rather as a seamless collection of interdependent elements. Consistent with that approach, our courts have utilized the mosaic doctrine as a remedial device that allows reviewing courts to remand cases for reconsideration of all financial orders even though the review process might reveal a flaw only in the alimony, property distribution or child support awards." (Internal quotation marks omitted.) *Valentine* v. *Valentine*, 149 Conn. App. 799, 803, 90 A.3d 300 (2014).

I

The plaintiff's first claim addressed on appeal is that the trial court, without mention of any statute or agency regulation, improperly declined to award child support for the oldest child. We first emphasize that, "[n]otwithstanding the great deference accorded the trial court in dissolution proceedings, a trial court's ruling . . . may be reversed if, in the exercise of its discretion, the trial court applies the wrong standard of law." (Internal quotation marks omitted.) *Kiniry* v. *Kiniry*, 299 Conn. 308, 316, 9 A.3d 708 (2010).

"The legislature has enacted several statutes to guide courts in fashioning child support orders. General Statutes § 46b-84 provides in relevant part: '(a) Upon or subsequent to the annulment or dissolution of any marriage or the entry of a decree of legal separation or divorce, the parents of a minor child of the marriage, shall maintain the child according to their respective abilities, if the child is in need of maintenance. . . .

" '(d) In determining whether a child is in need of maintenance and, if in need, the respective abilities of the parents to provide such maintenance and the amount thereof, the court shall consider the age, health, station, occupation, earning capacity, amount and sources of income, estate, vocational skills and employability of each of the parents, and the age, health, station, occupation, educational status and expectation, amount and sources of income, vocational skills,

employability, estate and needs of the child. . . .' " *Kiniry* v. *Kiniry*, supra, 299 Conn. 318–19. Additionally, in accordance with *Maturo* v. *Maturo*, 296 Conn. 80, 92, 995 A.2d 1 (2010), child support orders must be made pursuant to the principles established by statute and guidelines, a presumptive amount of child support must be calculated, and any deviation must be accompanied by the court's explanation as to why the guidelines are inequitable or inappropriate and why deviation is necessary to meet the needs of the child. General Statutes § 46b-215b (a).

In the present case, the trial court did not discuss either the § 46b-84 (d) "need of maintenance" criteria, or the deviation requirement imposed by *Maturo*. Instead, the court simply stated that, "[n]o order of child support is entered for the [oldest] minor child . . . . He has graduated from high school, will be attending [college] in September 2013, and the parties are ordered to contribute to his postsecondary education." The court did not offer any reason for its deviation from the guidelines, nor did it justify why the eldest child was no longer in need of maintenance and thus excluded from the final award of child support. Evidence was offered at trial that the oldest child lived in the plaintiff's home, was seventeen years old and was about to attend college in the fall of 2013. The court failed to make a determination whether the oldest child was ineligible or in need of "maintenance," and this failure represents a deviation from the requirements of § 46b-84. Additionally, under the holding in *Maturo*, which explicitly calls for an on-the-record explanation of any such deviation from the presumptive amount, the court also failed to articulate an on-the-record basis for a deviation amounting to 100 percent with respect to that child.[7]

## II

The plaintiff's next claim is that the court made clearly erroneous findings of fact regarding the defendant's gambling debt. Specifically, the court found the defendant had amassed a gambling debt of $198,000, despite a joint stipulation by the parties, which stated the debt was $110,029.

"At the outset, we note that the court's factual determinations will not be overturned on appeal unless they are clearly erroneous. . . . As a reviewing court, we may not retry the case or pass on the credibility of witnesses. . . . Our review of factual determinations is limited to whether those findings are clearly erroneous. . . . We must defer to the trier of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence

is left with the definite and firm conviction that a mistake has been committed." (Citation omitted; internal quotation marks omitted.) *Riscica* v. *Riscica*, 101 Conn. App. 199, 204–205, 921 A.2d 633 (2007).

In her brief, the plaintiff states that the court's departure from the gambling debt the parties stipulated to resulted in a miscalculation of roughly $100,000. Following the court's memorandum of decision, the plaintiff filed a motion for clarification of decision and orders, in which she sought clarification for the miscalculation, which was denied by the court. We first note that the court failed to support its finding that the gambling debt exceeded the parties' stipulation of approximately $110,000. Furthermore, there is no evidence in the record to support departing from the stipulated debt amount and the defendant acknowledges that despite the stipulation, the court found an amount far in excess of that agreed upon.[8] In light of such an apparent oversight, without explanation, we are persuaded that this finding by the court was clearly erroneous.

In addition to our determination that the gambling debt finding was clearly erroneous, we cannot speculate whether the court on remand will make the same or different orders regarding the division of the assets and liabilities of the parties, in consideration of the proper amount of gambling debt. This determination will be a matter for the discretion of the court on remand. See *Cuneo* v. *Cuneo*, 12 Conn. App. 702, 710, 533 A.2d 1226 (1987).

### III

We next address the plaintiff's claim regarding the Nikahnama. The plaintiff claims that the court, in crafting its financial orders, failed to award her damages related to the Nikahnama, a contract into which the parties had entered prior to the marriage. The plaintiff argues that the court's finding that a valid contract had not been proven was erroneous in light of the parties' joint stipulation of facts. Therefore, the plaintiff further argues, the court's determination that the defendant had no obligation to her created by the Nikahnama was also in error.

In its memorandum of decision, the court stated in relevant part: "The parties entered into a 'Nikahnama,' (referred to as a marriage contract) also known as a marriage deed when they married. Several versions of the Nikahnama were submitted into evidence. None of the Nikahnamas submitted had been signed by either party. In each of the Nikahnamas the amount promised [the plaintiff] was $4815.40 and 'half of the payment was to be "prompt" and half "deferred."' The [plaintiff] seeks payment from [the defendant]. The [defendant] remitted moneys to the [plaintiff] and to her family on multiple occasions during their marriage. He contends that the remittances satisfied any obligation he may

have had to pay a dowry or the amount promised to the [plaintiff] or her family, pursuant to the Nikahnama. The court finds that the [plaintiff] failed to prove by a preponderance of evidence that [the] parties entered into a valid marriage contract (Nikahnama), that the [defendant] failed to pay the amount promised, and that she is owed $4815.40 pursuant to the Nikahnama.''

The joint stipulation of facts submitted to the court, on which the plaintiff relies, states in relevant part: ''At the time of the parties' marriage, they executed a [Nikahnama] or marriage deed, an essential component of the Islamic marriage. The contract provided that half of the payment was to be 'prompt' and half 'deferred.' The amount promised was . . . $4815.40.''

At trial, three documents entitled ''Nikahnama'' were introduced into evidence. These documents differed with regard to certain key details, including the plaintiff's date of birth and the date of the parties' marriage. Another document in evidence, which the parties describe as a Nikahnama, is not written in English. Significantly, none of these documents bore the signatures of either party. The plaintiff asserts that the Nikahnama was a binding contract that required the payment of $4815.40. At trial, the defendant testified that he had, in fact, signed a Nikahnama that required the payment of $4815.40 to the plaintiff.

We recognize that ''[a] formal stipulation of facts by the parties to an action constitutes a mutual judicial admission and under ordinary circumstances should be adopted by the court in deciding the case.'' (Internal quotation marks omitted.) *Cantonbury Heights Condominium Assn., Inc.* v. *Local Land Development, LLC*, 273 Conn. 724, 745, 873 A.2d 898 (2005). Although, by means of the joint stipulation, the defendant stipulated that he had executed a Nikahnama, this does not mean he stipulated to sufficient facts for the trial court to find that the Nikahnama created a valid contract, enforceable in this jurisdiction, between the parties, or that he owed the plaintiff any moneys related to it. Thus, the stipulation did not constitute an acknowledgement by the defendant of a debt owed the plaintiff or otherwise relieve the plaintiff of her burden of proving that the Nikahnama created a valid, enforceable contract.

The defendant suggests that if the Nikahnama was enforceable under Islamic and Bangladeshi law, it would limit the plaintiff's recovery to $4815.40. Setting aside the issues that necessarily would arise were a court to consider treating the Nikahnama as a prenuptial agreement executed under relevant law; see Connecticut Premarital Agreement Act, General Statutes § 46b-36a et seq.; we do not find the court's conclusions unreasonable. The evidence reflected various documents entitled Nikahnama; all of them differed in terms of key provisions, and none were signed by the parties.

Under these circumstances, the court properly determined that the plaintiff failed to demonstrate the existence of a valid contract.

Based on the record, we are persuaded that the court did not improperly dismiss the existence of a joint stipulation, but instead determined that based upon the evidence, the stipulation, and the testimony before it, it was unable to find that the plaintiff had proven by a preponderance of the evidence the necessary elements of a contract, thereby determining that the defendant was not required to pay the $4815.40.

IV

This court recently held in *Barcelo* v. *Barcelo*, 158 Conn. App. 201, 118 A.3d 657, cert. denied, 319 Conn. 910, A.3d (2015), that upon a finding of an inherently flawed order within a mosaic, it must determine whether it was required to send all financial orders back for reconsideration. The court in *Barcelo* highlighted its adherence to the mosaic doctrine but noted that "[e]very improper order, however, does not necessarily merit a reconsideration of all of the trial court's financial orders. A financial order is severable when it is not in any way interdependent with other orders and is not improperly based on a factor that is linked to other factors. . . . In other words, an order is severable if its impropriety does not place the correctness of the other orders in question." (Citation omitted; internal quotation marks omitted.) Id., 226. In the present case, in the absence of a proper basis for its decision or an explanation as to why the eldest child was omitted from the child support order, the court abused its discretion in not correctly applying the law. In addition, the trial court miscalculated the defendant's gambling losses by a significant amount, and abused its discretion by dividing marital assets based on clearly erroneous factual findings. As in *Barcelo*, we conclude that reversing the court's child support order in the present case inevitably impacts all of the other financial orders and such an order cannot be individually severed. See id., 227.

We are unable to determine whether the court's financial orders would remain intact after the trial court reconsiders its orders concerning child support and the distribution of the parties' assets.' Therefore, the court must, on remand, reconsider all of the financial orders. Because we affirm as to the Nikahnama, the court need not consider that issue on remand.

The judgment is reversed only as to all financial orders and the case is remanded for further proceedings consistent with this opinion. The judgment is affirmed with respect to the finding that the Nikahnama was unenforceable and in all other respects.

In this opinion the other judges concurred.

[1] Regs., Conn. State Agencies § 46b-251a et seq.

[2] The trial court defined a Nikahnama, referred to by the parties as a marriage contract, as a marriage deed.

[3] Due to the interest of the state of Connecticut in this action, the Attorney General appeared as a party on September 7, 2011, pursuant to General Statutes § 46b-55, and filed prayers of relief on July 6, 2012, and proposed orders on April 18, 2013. There was no objection by either party to the relief requested.

[4] Additionally, the court found that the defendant has continually renewed and maintained his taxi driver's license since 1989, and it did not credit his "unsubstantiated testimony that he ceased to drive a taxi in 2013 due to not being able to get into a taxi and alleged back pain."

[5] In consideration of its orders, the court stated that prior to trial, a child support order was entered on April 11, 2011. The defendant was "ordered to pay $66.80 per week until a pendente lite arrearage of $918 had been satisfied in full. A wage execution was issued to secure the payment. The wage execution for the $66.80 per week continued long after the arrearage had been satisfied in full. As of June 13, 2013, $7481.60 had been withheld pursuant to the wage execution for the arrearage." The court concluded that the defendant overpaid his arrearage by $6563.60.

[6] The court made the following postsecondary educational support orders: "The parties shall contribute to the postsecondary education of [the oldest minor child] for a period of four academic years or until he has reached the age of twenty-three. The [plaintiff] shall contribute ten (10%) percent and the [defendant] shall contribute ninety (90%) percent of the cost of [the child's] college educational expenses for a four year degree, net of scholarships or grants, subject to the limitation that said cost shall not exceed the tuition for a full-time residential student at the University of Connecticut."

[7] In the circumstances of this case, we need not consider in detail the plaintiff's claim that the child support order with respect to the younger children deviated from the guidelines without explanation, because the financial orders must be reconsidered by the trial court in their entirety.

[8] The stipulation stated that "discovery provided to date shows the Defendant's gambling losses:

"Mohegan Sun  .  .  .  $88,745

"Foxwoods  .  .  .  $21,284

"Total: $110,029.00  .  .  .  ."

In its decision, the trial court stated that the losses at the Mohegan Sun Casino exceeded $88,000, and the losses at the Foxwoods Casino exceeded $110,000. It then concluded that "there is an unknown but significant amount of credit card debt in the [plaintiff's] sole name, which she did not incur and was not for their joint or household benefit." It ordered the defendant to pay all of these debts. The plaintiff argues, and this court agrees, that even though the trial court instructed that the defendant would assume all of the credit card debt, its error in stating the value of gambling losses may have affected other financial orders.